IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F I L E D

AUG 1 3 2007

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

QSA GLOBAL GmbH,                          :
                                          :
        Plaintiff,                        :
                                          :
vs.                                       :      CASE NO. 1:07-CV-408 (CRH/BRP)
                                          :
BEST MEDICAL INTERNATIONAL, INC.,         :
                                          :
        Defendant.                        :

## LETTER OF REQUEST

**From:**     The United States District Court for the Eastern District of Virginia
              Alexandria Division
              401 Courthouse Square
              Alexandria, Virginia 22314
              United States of America
              Tel: (703) 299-2100

**To:**       The Central Authority for the Federal Republic of Germany
              Lower Saxony District (Niedersachsen)
              Niedersächsisches Ministerium der Justiz und für Europaangelegenheiten
              Am Waterlooplatz 1
              30169 Hanover
              Tel:  +49 (511) 120-0
              Fax: +49 (511) 120-5170/5181

**Return To:**  Susan Richards Salen
                Maureen E. Carr
                Rees Broome, PC
                8133 Leesburg Pike, Ninth Floor
                Vienna, Virginia 22182
                Tel:  (703) 790-1911
                Fax: (703) 356-0527
                Counsel to the Defendant, Best Medical International, Inc.

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE ON TAKING EVIDENCE IN CIVIL MATTER PURSUANT TO THE HAGUE CONVENTION OF MARCH 18, 1970

The United States District Court for the Eastern District of Virginia, Alexandria Division, presents its compliments to the Central Authority for the Federal Republic of Germany, Lower Saxony District, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter.

The Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the Central Authority for the Federal Republic of Germany compel the appearance of the individuals named herein to provide evidence as described herein.

In support of this Request, the Court provides the following information:

## I.   Parties to the Proceeding

**A.    Plaintiff:**        QSA Global GmbH
                            Gieselweg 1
                            38001 Braunschweig
                            Postfach 11 37
                            38001 Braunschweig
                            Federal Republic of Germany

**Counsel:**        Deirdre Johnson
                    John Letteri
                    LeBoeuf, Lamb, Greene & MacRae, LLP
                    1101 New York Avenue, N.W., Suite 1100
                    Washington, D.C. 20005
                    Tel:  (202) 986-8000
                    Fax: (202) 986-8102

                    Alan Howard
                    Jonathan D. Siegfried
                    Lawrence S. Hirsh
                    LeBoeuf, Lamb, Greene & MacRae LLP
                    125 W. 55th Street
                    New York, NY 10019-5389
                    Tel:  (212) 424-8000
                    Fax: (212) 424-8500

2

**B.**   **Defendant:**   Best Medical International, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
United States of America

**U.S. Counsel:** Susan Richards Salen
Maureen E. Carr
Rees Broome, PC
8133 Leesburg Pike, Ninth Floor
Vienna, Virginia 22182
Tel: (703) 790-1911
Fax: (703) 356-0527

**German**   Dr. Stefan Kugler, LL.M.
**Counsel:**   Katharina Weimer, LL.M.
Reed Smith LLP
Fünf Höfe
Theatinerstrasse 8
Munich, D-80333
Germany
Tel: +49 (0)89 20304 10
Fax: +49 (0)89 20304 199

## II.   <u>Summary of Case</u>

### A.   **Statement of Facts**

On October 14, 1999, AEA Technology-QSA, GmbH ("AEAT"), the predecessor of the

Plaintiff, QSA Global GmbH ("QSA"), entered into an agreement with Novoste Corporation

("Novoste"), under which AEAT and Novoste agreed to jointly develop radioactive source

materials using strontium-90 aluminum fluoride isotopes and to construct a facility (to be located

in Braunschweig, Germany) in which such isotopes would be encapsulated in Sources and/or

Source Trains ("Source Manufacturing Agreement"). These Sources/Source Trains were used by

Novoste in its Beta-Cath™ product. The Beta-Cath™ product consists of a catheter with a

radioactive seed used in the implanting of the radioactive seed in patients suffering from prostate

cancer and other cancers. This type of treatment is known as brachytherapy.

Under the terms of the Source Manufacturing Agreement, AEAT was prohibited from using technology developed exclusively by Novoste ("Novoste Technology") or intellectual property jointly developed by Novoste and AEAT ("Jointly Owned Arising IP") except for the benefit of Novoste or with the permission of Novoste. AEAT was not prohibited from using its own pre-existing technology, referred to in the Source Manufacturing Agreement as "Background Technology." The Source Manufacturing Agreement was separated into the following phases: development phase, facility program phase, and a commercial phase involving the manufacture and supply obligation phase. Under the commercial phase, Novoste was required to purchase certain minimum requirements of Sources/Source Trains or, if it did not meet its minimum required purchases, pay AEAT a "penalty."

Subsequent to the execution of the Source Manufacturing Agreement, QSA became AEAT's successor. Thereafter, on October 12, 2005, Novoste, Best Vascular, Inc. ("Best Vascular"), and Defendant Best Medical International, Inc. ("BMI") entered into an Amended and Restated Asset Purchase Agreement ("APA"), under which Best Vascular acquired substantially all of the assets of Novoste related to its vascular brachytherapy technology business. Pursuant to the APA, Best Vascular also assumed certain liabilities of Novoste, including the Source Manufacturing Agreement. QSA consented to Novoste's assignment of the Source Manufacturing Agreement to Best Vascular in June of 2006. The Source Manufacturing Agreement terminated on September 15, 2006.

Prior to the assignment of the Source Manufacturing Agreement, Novoste alleged that QSA had violated the Source Manufacturing Agreement by using the Novoste Technology, the Jointly Owned Arising IP and/or the Facility to develop and/or manufacture products for NeoVista, Inc., a California corporation ("NeoVista"). NeoVista and QSA are developing a

4

medical product that uses Strontium-90 aluminum fluoride seeds for procedures to treat macular degeneration. The APA closed before Novoste took any action other than putting QSA on notice that Novoste asserted that QSA was in breach of the Source Manufacturing Agreement.

### B.    Procedural History

On April 25, 2007, QSA filed a Complaint for Sums Due and Owing against BMI, asserting that BMI is liable for Best Vascular's breach of the Source Manufacturing agreement by virtue of an alleged guaranty agreement contained in the APA. QSA alleges that Best Vascular breached the Source Manufacturing Agreement by (a) failing to meet minimum purchase requirements, (b) failing to purchase minimum inventory stock, (c) failing to pay the reasonable costs for decontamination and decommissioning of the Braunschweig facility, and (d) failing to pay for services rendered by QSA.

On May 21, 2007, BMI filed a 12(b)(6) Motion to Dismiss QSA's Complaint for failure to state a claim upon which relief can be granted, based on the allegation that QSA is neither a party to nor a third-party beneficiary of the APA which contains the alleged guaranty provisions. The Court entered an Order denying BMI's Motion to Dismiss on June 26, 2007 on the grounds that the motion presented factual issues better determined by a Summary Judgment Motion.

On July 11, 2007, BMI filed an Answer to QSA's Complaint and a Counterclaim alleging that QSA breached the Source Manufacturing Agreement by utilizing Novoste Technology, the Jointly Owned Arising IP and/or the Facility to develop and/or manufacture products for NeoVista. BMI asserts that QSA and NeoVista are using Novoste Technology, Jointly Arising IP and/or the Facility to manufacture and develop products for NeoVista all in violation of the Source Manufacturing Agreement. As a result of QSA's actions, BMI contends that under German law, QSA has been unjustly enriched and BMI is entitled to recover damages. On July

5

31, 2007, QSA filed a 12(b)(6) Motion to Dismiss BMI's Counterclaim, which is scheduled for hearing on September 7, 2007.

### C.    Letter of Request

This Letter of Request is necessary in order to discover facts crucial to the resolution of this action. The Source Manufacturing Agreement, which is the basis for the claim of QSA, a German corporation, against BMI, and BMI's counterclaim, is governed and controlled by German law. More importantly, the relevant facts, circumstances and events took place in QSA's manufacturing facility located in Braunschweig, Germany.

### III.   Nature of Request

#### A.    Persons to Be Examined:

**1.    Dr. Eberhard Fritz (German citizen)**
Broitzemer Strasse 246
Braunschweig D 38118
Germany
efritz@drefritz.de
(531-250-5096)

Dr. Eberhard Fritz is a German national who is a former employee and now an independent consultant to QSA in Braunschweig, Germany.

**2.    Dr. Rainer Lambricht (German citizen)**
Eichhörnchenweg 11A
21521 Aumühle
Germany
41047450

Dr. Rainer Lambricht is a German national who is a former Managing Director of QSA Global, GmbH.

6

**B.     Questions/Subject Matter of Examination:**

       **1.     Dr. Eberhard Fritz**

During his employment with QSA, Dr. Fritz was the Manager of the Novoste Project. BMI believes that Dr. Fritz will have crucial knowledge relevant to the following questions/subject matters:

       a.      What constitutes QSA's Background Technology, Jointly Owned Arising IP, and Novoste's Technology under the Source Manufacturing Agreement.

       b.      What was QSA's prior use, development or knowledge of strontium-90 fluoride cores.

       c.      What intellectual property/technology or trade secrets were developed in order to encapsulate the radioactive isotopes used in the Sources and Source Trains manufactured by QSA for Novoste.

       d.      Did QSA use facilities other than the Facility constructed with Novoste funds to develop the product used in the Beta-Cath™.

       e.      What knowledge does Dr. Fritz have regarding the use by QSA of Background Technology, the Jointly Owned Arising IP and/or Novoste's Technology in the development, or manufacture, of any NeoVista, Inc.'s product.

       f.      In what facility did QSA perform any development work for or production of products for NeoVista, Inc.

       g.      What use has QSA made of the Facility during and after the Source Manufacturing Agreement expired and has such Facility been used by QSA for the development and/or manufacturing of products for NeoVista, Inc. or any other person or entities.

7

    h.  How much did Novoste pay to QSA (or its predecessor) to construct the Facility and/or to develop the Jointly Owned Arising IP or to determine how to encapsulate the strontium-90 aluminum fluoride cores.

    i.  What did he know/understand concerning the claim made by Novoste that QSA breached the Source Manufacturing and/or any other agreements between Novoste and QSA (or its predecessor) by using the Facility for products other than Novoste's.

    j.  What was QSA's (or his) response to Novoste concerning its claim of QSA's breach of the Source Manufacturing Agreement and was the response in writing.

    k.  With respect to QSA's claim against BMI, how was the minimum purchase which Novoste had to buy from QSA (or its predecessor) determined.

    l.  What portion of the per Source/Source Train price did QSA allocate to its obligation to dispose of Sources at the end of the useful life of a Source Train as specified under paragraph 9.3 of the Source Manufacturing Agreement.

    m.  What steps had QSA taken or did QSA take to prepare for the obligation to dispose of Sources at the end of the useful life of a Source Train.

    n.  What did QSA intend to do if and when it received any request by Novoste (or its successors and assigns) to dispose of Sources at the end of the useful life of a Source Train.

    o.  What is his knowledge of the existence of any reports, analysis or other documents referring to decontamination and decommissioning costs relevant to the Hot Cell and other dedicated Equipment and/or the Facility (as those terms are defined under the Source Manufacturing Agreement).

p.      What are the costs to decontaminate and decommission the Hot

Cell, Equipment and/or Facility.

q.      The identification of the persons at QSA (or its predecessor)

responsible for preparing or determining the costs to decontaminate and decommission the Hot

Cell, Equipment and/or Facility.

r.      What were the communications between Novoste and QSA (or its

predecessor) concerning Novoste's obligations under Article 6.1 of the Source Manufacturing

Agreement to establish an Escrow Account for the costs to decontaminate and decommission the

Hot Cell, Equipment and/or Facility.

s.      Describe the nature and substance of any communications

regarding the costs to decontaminate and decommission the Hot Cell, Equipment or Facility

between agents and employees of Novoste and agents and employees of QSA (or its

predecessor).

t.      What are the names, locations or persons in possession of any

reports setting forth, discussing or describing the decontamination and decommissioning costs

for the Hot Cell, Equipment or Facility or the entire QSA manufacturing facility in

Braunschweig.

u.      Description, location and identification of persons who are in

possession of any of the reports, analyses, or documents referring to decontamination and

decommissioning costs relevant to the Hot Cell, Equipment and/or Facility or the entire QSA

manufacturing facility located in Braunschweig, Germany.

v.      The identification by name, title, author or date of any report filed

by QSA (or its predecessor) with any governmental/regulatory agency (and the name of such

9

governmental/regulatory agency) that contains information concerning the decontamination and decommissioning costs relevant to the Hot Cell, Equipment and/or Facility or the entire QSA manufacturing facility located in Braunschweig, Germany.

        w.     What communications has he had with BMI, Best Vascular and/or Novoste concerning the assignment of the Source Manufacturing Agreement to Best Vascular.

        x.     What communications did he have with Dr. Rainer Lambricht concerning the assignment of the Source Manufacturing Agreement to Best Vascular.

        y.     Has he had any communications with NeoVista concerning the development of encapsulated strontium-90 aluminum fluoride.

        z.     What was his involvement in the development and/or production of products for NeoVista.

        aa.     The identification/description and location of any documents containing information relating to the subject matter of the questions set forth above.

        bb.     Follow-up questions to responses given as appropriate.

**2.    Dr. Rainer Lambricht**

During his employment with QSA, Dr. Lambricht was the Managing Director of QSA. BMI believes that Dr. Lambricht will have crucial information concerning the following subject matters/questions:

        a.     What was the substance, nature and extent of his communications with Best Vascular, BMI or Novoste concerning the assignment of the Source Manufacturing Agreement to Best Vascular.

b.    What was his understanding of the nature of any purported guaranty agreement obligation owed by BMI to QSA with respect to Best Vascular's performance under the Source Manufacturing Agreement.

c.    With whom did Dr. Lambricht discuss the assignment to Best Vascular of the Source Manufacturing Agreement.

d.    Describe the specific conversations or communications that Dr. Lambricht had with the President of Best Vascular, Krishnan Sunthanthiran, concerning the assignment of the Source Manufacturing Agreement.

e.    Describe the specific conversations or communications that Dr. Lambricht had with the President of Best Vascular, Krishnan Sunthanthiran, concerning BMI's purported guaranty of Best Vascular's obligations to QSA or to Novoste.

f.    What communications did Dr. Lambricht have with Shawn Weingast, Esq., General Counsel of Best Vascular, concerning BMI's purported guaranty of Best Vascular's obligations to QSA or to Novoste.

g.    Describe the specific conversations or communications that Dr. Lambricht had with any agent or employee of Novoste concerning the assignment of the Source Manufacturing Agreement.

h.    Describe the specific conversations or communications that Dr. Lambricht had with any agent or employee of Novoste concerning BMI's purported guaranty of Best Vascular's obligations to QSA or to Novoste.

i.    Identify dates, location and substance of any written communications between Dr. Lambricht and any agent or employee of Best Vascular, BMI or Novoste regarding the assignment of the Source Manufacturing Agreement to Best Vascular.

j.     Identify dates, location and substance of any written communications between Dr. Lambricht and any agent or employee of Best Vascular, BMI or Novoste regarding the purported guaranty by BMI to QSA of Best Vascular's performance under the Source Manufacturing Agreement.

k.     What pres releases, news, and media articles did he read or hear about concerning the APA.

l.     What is his understanding of BMI's obligations, if any, to QSA, and what is the basis for any such understanding.

m.     What does he know about the claim made by Novoste that QSA breached the Source Manufacturing Agreement and/or any other agreements between Novoste and QSA by using the Facility, Novoste Technology and/or Jointly Owned Arising IP for the development and/or manufacture of products other than for Novoste.

n.     If he knows about Novoste's claim, what does he know about QSA's responses to such claim.

o.     What was QSA's response to Novoste's claim of an alleged breach of the Source Manufacturing Agreement.

p.     If he does not have the information regarding Novoste's claims, who at QSA would have such information.

q.     The identification, by author, date, document title and location of any document relating to Novoste's claim that QSA breached the Source Manufacturing Agreement, and QSA's response to such claim.

r.     With respect to QSA's claim against BMI, how was the minimum purchase which Novoste had to buy from QSA (or its predecessor) determined.

12

s.    What portion of the per Source/Source Train price did QSA allocate to its obligation to dispose of Sources at the end of the useful life of a Source Train as specified under paragraph 9.3 of the Source Manufacturing Agreement.

t.    What steps had QSA taken or did QSA take to prepare for the obligation to dispose of Sources at the end of the useful life of a Source Train.

u.    What did QSA intend to do if and when it received any request by Novoste (or its successors and assigns) to dispose of Sources at the end of the useful life of a Source Train.

v.    What additional overhead is/was QSA incurring as a result of Best Vascular's purported failure to pay for and/or perform the decontamination and decommissioning of the Hot Cell, Equipment or Facility.

w.    What documents identify, describe or relate to the additional overhead QSA is/was incurring as a result of Best Vascular's purported failure to pay for and/or perform the decontamination and decommissioning of the Hot Cell, Equipment or Facility.

x.    What is his knowledge of the existence any reports, analysis or other documents referring to decontamination and decommissioning costs relevant to the Hot Cell and other dedicated Equipment and/or the Facility (as those terms are defined by the Source Manufacturing Agreement).

y.    What are the costs to decontaminate and decommission the Hot Cell, Equipment and/or Facility.

z.    The identification of the persons at QSA (or its predecessor) responsible for preparing or determining the costs to decontaminate and decommission the Hot Cell, Equipment and/or Facility.

13

aa.     What were the communications between Novoste and QSA (or its predecessor) concerning Novoste's obligations under Article 6.1 of the Source Manufacturing Agreement to establish an Escrow Account for the costs to decontaminate and decommission the Hot Cell, Equipment and/or Facility.

bb.     Describe the nature and substance of any communications regarding the costs to decontaminate and decommission the Hot Cell, Equipment or Facility between agents and employees of Novoste and agents and employees of QSA (or its predecessor).

cc.     What are the names, locations or persons in possession of any such reports setting forth, discussing or describing the decontamination and decommissioning costs for the Hot Cell, Equipment or Facility or the entire QSA manufacturing facility in Braunschweig.

dd.     Description, location and identification of persons who are in possession of any of the reports, analyses, or documents referring to decontamination and decommissioning costs relevant to the Hot Cell, Equipment and/or Facility or the entire QSA manufacturing facility located in Braunschweig, Germany.

ee.     The identification by name, title, author or date of any report filed by QSA (or its predecessor) with any governmental/regulatory agency (and the name of such governmental/regulatory agency) that contains information concerning decontamination and decommissioning costs relevant to the Hot Cell, Equipment and/or Facility or the entire QSA manufacturing facility located in Braunschweig, Germany.

ff.     What communications did he have with Dr. Eberhard Fritz or Hugh Evans or any other employees of QSA concerning the assignment of the Source

14

Manufacturing Agreement to Best Vascular or the purported guaranty by BMI to QSA of the performance of such agreement.

gg.    Has he had any communications with NeoVista concerning the development of encapsulated strontium-90 aluminum fluoride.

hh.    What was his involvement in the development and/or production of products for NeoVista.

ii.    The identification/description and location of any documents containing information relating to the subject matter of the questions set forth above.

jj.    Follow-up questions to responses given as appropriate.

**C.    Documents to Be Reviewed by Dr. Fritz and Dr. Lambricht:**

1.    Source Manufacturing Agreement, documents produced by QSA in discovery that relate to QSA's damages, documents relating to any of NeoVista, Inc.'s products;

2.    Written communications between QSA, Novoste and Best Vascular concerning alleged breaches of the Source Manufacturing Agreement by virtue of QSA's use of the Facility, Jointly Owned Arising, IP and/or Novoste Technology;

3.    Patent Applications and published patents of QSA relating to Strontium-90 Fluoride;

4.    Documents relating to the manufacture of sealed radiation sources for NeoVista, Inc.;

5.    Documents relating to the use of the Facility developed for Novoste, documents or reports relating to costs of decontamination and decommissioning of the Novoste Facility;

6.    Medical Device Records;

7.      Written communications between QSA and BMI and/or Best Vascular concerning the assignment of the Source Manufacturing Agreement;

8.      Written communications between QSA and Novoste concerning the assignment of the Source Manufacturing Agreement;

9.      Invoices purporting to show amounts due to QSA from Best Vascular;

10.     Press releases, news and/or media articles relevant to the APA;

11.     Documents showing or relating to QSA's obligation to dispose of Sources at the end of their useful life;

12.     Reports and/or any other documents relating to the calculation of, or damages for the cost of decontamination and decommissioning of the Facility;

13.     Contracts between Novoste and QSA;

14.     Documents that reflect overhead incurred by QSA for the alleged failure of Best Vascular to pay for and/or perform the decontamination and decommissioning of the Facility; and

15.     All written communications or documents memorializing communications between Best Vascular or BMI and/or QSA after the announcement of the APA to the present.

## IV.   **Procedural Issues**

### A.    **Requirement that Testimony Be Under Oath:**

As the proceeding is pending in the United States were testimony under oath is required, the testimony must be under oath. In addition, the witness must also be examined by QSA.

**B.**     **Special Methods/Procedures to Be Followed:**

Given the technical nature and the extent of the questions to be asked, BMI is requesting

that the examination be conducted by Susan Richards Salen, Esq. or another duly qualified

lawyer representing BMI as commissioner.

It is also requested that the examination be stenographically transcribed and/or

videotaped so that it may be admissible at a trial of this matter in this Court.

**C.**     **Special Rights of Witness:**

The witness will have the right to assert any applicable privileges.  The witness may be

represented by counsel.

**D.**     **Notice to Counsel:**

BMI requests that the following persons be notified of the time and place for examination

of witness:

      **1.**     **Counsel for Plaintiff QSA:**

> Deirdre Johnson
> John Letteri
> LeBoeuf, Lamb, Greene & MacRae, LLP
> 1101 New York Avenue, N.W., Suite 1100
> Washington, D.C. 20005
> Tel:  (202) 986-8000
> Fax: (202) 986-8102
>
> Alan Howard
> Jonathan D. Siegfried
> Lawrence S. Hirsh
> LeBoeuf, Lamb, Greene & MacRae LLP
> 125 W. 55th Street
> New York, NY 10019-5389
> Tel:  (212) 424-8000
> Fax: (212) 424-8500

2.   **Counsel for BMI:**

> Susan Richards Salen
> Maureen E. Carr
> Rees Broome, PC
> 8133 Leesburg Pike, Ninth Floor
> Vienna, Virginia 22182
> Tel:  (703) 790-1911
> Fax: (703) 356-0527
>
> Dr. Stefan Kugler, LL.M.
> Katharina Weimer, LL.M.
> Reed Smith LLP
> Fünf Höfe
> Theatinerstrasse 8
> Munich, D-80333
> Germany
> Tel:  +49 (0)89 20304 10
> Fax: +49 (0)89 20304 199

**E.   Attendance of Counsel at Examination:**

BMI requests that its Counsel identified above be permitted to attend and examine as commissioner and if such request is not granted that it be able to attend the examination conducted by judicial personnel.  BMI also requests that QSA be permitted to attend.

**IV.   Statement Regarding Reciprocity**

In recognition of the assistance provided by the judicial authorities of the Federal Republic of Germany in this matter and pursuant to the Hague Convention, this Court hereby expresses its willingness to provide similar assistance to judicial authorities of the Federal Republic of Germany.

18

## V.   Reimbursement for Costs

BMI will reimburse all fees and costs incurred by the witnesses which are reimbursable

under Art. 14, ¶ 2, or Art. 26 under the Hague Convention of March 18, 1970.

BMI will reimburse judicial authorities of receiving state for costs incurred in executing

this Request.

Dated: _____ 8/13/07

/s/
Barry R. Poretz
United States Magistrate Judge
United States Magistrate Judge Barry R. Poretz

The United States District Court for the Eastern
District of Virginia, Alexandria Division
401 Courthouse Square
Alexandria, Virginia 22314
United States of America